IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PODIATRY IN MOTION, INC., on behalf of plaintiff and the class members defined herein, ) ) ) ) | |
| Plaintiff, ) ) | No. 16-cv-2653 |
| v. ) ) | Judge Lee |
| COVERMYMEDS, LLC, and JOHN DOES 1-10, ) ) ) | Magistrate Judge Cole |
| Defendant. ) | |

**PLAINTIFF'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF**
**PRELIMINARY APPROVAL OF CLASS SETTLEMENT**

Plaintiff submits this memorandum in response to the issue the Court raised at presentment of Plaintiff's Motion for Preliminary Approval of the proposed settlement – namely whether the increased recovery allocated to Non-Transactional Faxes[1] under the Settlement Agreement creates an intra-class conflict between recipients of Transactional Faxes and Non-Transactional Faxes which necessitates the creation of subclasses and separate counsel to represent each subclass.

In short, the answer is no. The structure of the settlement does not create a conflict requiring either subclasses or separate counsel. The law is clear: division of a class into subclasses "typically turns on whether the original class has members whose interests are divergent or antagonistic, which can lead to the conclusion that a single class representative is not 'typical' of divergent groups." *Bridgeview Health Care Center Ltd. v. Clark*, Civ. A. No. 09-cv-5601, 2013 WL 4495221, at *4 (N.D. Ill., Aug. 21, 2013) (citations omitted). The classic example of such an intra-class conflict is *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), which involved

---

[1] Non-Transactional and Transactional Faxes are defined in the Settlement Agreement and that definition is applicable in this memorandum. See Dkt. #32-1 at p. 23.

1

claimants seeking to maximize current payments for existing injuries from asbestos and other claimants seeking to maximize a fund to compensate for future asbestos injuries. Emphasizing the Court of Appeals' finding that "Many persons in the exposure-only category . . . may not even know of their exposure, or realize the extent of the harm they may incur" and that "Even if they fully appreciate the significance of class notice, those without current afflictions may not have the information or foresight needed to decide, intelligently, whether to stay in or opt out," the Supreme Court found that separate counsel was required. (591 U.S. at 628)

In cases, however, not presenting such intractable problems, separate subclasses and separate subclass counsel is not necessary. Put simply, subclasses and separate subclass counsel are not required merely when some class members' claims are stronger than others, justifying differing levels of recovery for the same injury, and where the differential in recovery and the reasons for the differential are quantified and easily comprehended by the class members. *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010*, 910 F.Supp.2d 891, 917 (E.D.La. 2012).

Judge Feinerman recently addressed this issue in approving a TCPA class action settlement with differential payouts for different claims. In that case, the Court rejected an objector's argument that differing payments to class members created an intra-class conflict that required separate counsel: "The fact that class members have claims of different strength, warranting different awards, does not require that each group be represented by separate counsel." *Gehrich v. Chase Bank USA, N.A.,* No. 12 CV 5510, 2016 WL 806549 at *5 (N.D. Ill., Mar. 2, 2016), *appeal pending*.

Because the differential in this case reflects "real and cognizable differences" between the "likelihood of ultimate success" for recipients of the two different types of faxes, *In re Lucent Techs., Inc., Secs. Litig.,* 307 F.Supp.2d 633, 649 (D.N.J. 2004), the allocation plan is proper

2

without separate classes or subclasses.

There is no reason to believe that the named plaintiff in this action cannot adequately represent the entire class. Plaintiff received both types of faxes. It received one Transactional and four Non-Transactional faxes. (See EX 1 - Hand Affdvt). Therefore Plaintiff has an interest in securing appropriate recovery for both Transactional Fax recipients and Non-Transactional Fax recipients. Nor is Plaintiff alone in this regard. Over half of the 618,337 class members[2] also received both types of faxes. Specifically, 269,516 persons received only Transactional Faxes; 36,225 persons received only Non-Transactional faxes; and 312,596 received both types of faxes. (See EX 1 - Hand Affdvt.). Consequently, the difference in recoveries did not result from some sort of improper bias, but rather from a difference in the risk of liability and likelihood of recovery. "[W]hen real and cognizable differences exist between the likelihood of ultimate success for different plaintiffs, it is appropriate to weigh distribution of the settlement in favor of plaintiffs whose claims comprise the set that was more likely to succeed." *Schulte v. Fifth Third Bank,* 805 F.Supp.2d 560, 589 (N.D. Ill. 2011); *quoting In re PaineWebber Ltd. Partnerships Litigation,* 171 F.R.D. 104,133 (S.D. N.Y. 1997) (internal quotations and citations omitted).

**I.  SUBCLASSES ARE NOT WARRANTED HERE AS THE INJURY SUSTAINED BY ALL CLASS MEMBERS IS IDENTICAL – NAMELY THE RECEIPT OF AN UNSOLICITED ADVERTISEMENT.**

All class members here sustained the same injury. They received one or more faxes which they assert are unsolicited advertisements sent in violation of the TCPA. As noted above, the fact that the class members have claims of varying strength which warrant compensation at different levels does not require that each group be represented by different counsel. *Gehrich,* 2016 WL

---

[2] Class size as of May 29, 2016.

806549 at *5.

The issue the Court raised really boils down to whether Plaintiff and Plaintiff's Counsel adequately represented all class members in negotiating the allocation scheme under which recipients of Transactional Faxes get one share per fax and recipients of Non-Transactional Faxes get five shares per fax. Plaintiff and over one-half of the class members received both Transactional and Non-Transactional Faxes. Thus there is no incentive for Plaintiff or its counsel to overcompensate Non-Transactional Fax recipients by undercompensating Transactional Fax recipients. Regardless, as Judge Feinerman held in *Gehrich,* the fact that recipients of Non-Transactional Faxes will receive a larger per fax recovery than recipients of Transactional Faxes is not a product of inadequate counsel but instead it is a reflection of the fact that recipients of Non-Transactional Faxes have stronger claims. *Id.*

It should also not be forgotten that the Court has the obligation in approving the settlement to ensure the amount of the Settlement is fair, reasonable and adequate. *Synfuel Techs., Inc. v. DHL Express (USA), Inc.,* 463 F.3d 646, 653 (7th Cir. 2006). The allocation scheme here is fair, reasonable and adequate as it takes into account the difference in the relative strength of claims among recipients of Transactional and Non-Transactional Faxes. As Judge Dow recently noted in *Schulte*, what would be arbitrary, unreasonable and unfair would be to ignore the relative weakness of the claims of the recipients of Transactional faxes. *Schulte*, 805 F. Supp. 2d at 590. It is appropriate to tailor the allocation scheme to ensure that the benefits of the settlement are available to all class members while protecting the interests of class members with the strongest claims. *Id.* at 589.

## II. THE SETTLEMENT WAS REACHED IN A MEDIATION BEFORE A NEUTRAL MEDIATOR WHO IS A RETIRED FEDERAL JUDGE AND WHO BELIEVES THE SETTLEMENT IS REASONABLE, FAIR AND ADEQUATE

The Parties retained a neutral mediator, Judge James Holderman (Ret.) to assist them in determining whether a settlement was possible. As the Court is aware, before his retirement on June 1, 2015, Judge Holderman was a District Court Judge in this District and the former Chief Judge of the District. While on the federal bench Judge Holderman presided over many class action cases including the largest TCPA class action settlement to date. Judge Holderman believes that there was no need for subclasses and that the settlement was fair, reasonable and adequate and that Plaintiff's Counsel adequately represented the interests of all class members in negotiating the settlement. Judge Holderman agreed with the Parties that there was a substantially greater possibility that the Court would find the Non-Transactional Faxes were "unsolicited advertisements" subject to the TCPA in contrast to the likelihood that the Court would find the Transactional Faxes were unsolicited advertisements. (See EX 2 - Declaration of Judge Holderman).

## III. SETTLEMENTS PROVIDING DIFFERENT AWARDS TO DIFFERENT CLASS MEMBERS BASED ON DIFFERENCES IN THE STRENGTH OF THEIR CLAIMS ARE PROPER

Courts have recognized that it is permissible to have differences in awards to different class members based on the strength of their claims without creating an intra-class conflict.

In *Gehrich*, a TCPA class was certified for settlement purposes including both credit card holders and bank account customers and providing that the credit card holders would receive three award units whereas the bank account customers would receive only one award unit, with persons in both categories receiving four award units. *Gehrich,* 2016 WL 806549 at

*4. Judge Feinerman overruled an objection that this distinction created an impermissible conflict, reasoning:

> This challenge to adequacy fails. It is true that the same attorney cannot vigorously represent the interests of two groups whose interests are not aligned. … Yet the larger awards available to Chase credit card holders is a product not of inadequate counsel, but of the stronger claims available to credit card holders as compared to Chase bank account customers, who as a condition of opening their accounts agreed to submit disputes to arbitration. Doc. 202 at 15. "[W]hen real and cognizable differences exist between the likelihood of ultimate success for different plaintiffs, it is appropriate to weigh distribution of the settlement in favor of plaintiffs whose claims comprise the set that was more likely to succeed." *Schulte v. Fifth Third Bank*, 805 F.Supp.2d 560, 589 (N.D.Ill.2011) (quoting *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y.1997)) (internal quotations marks omitted); see also *In re Cendant Corp. Litig.*, 264 F.3d 201, 250 (3d Cir. 2001) (approving a settlement with differential payouts because "the § 10(b) damages available to the class members in this case are generally greater than the § 11 damages available, so that in this respect the § 10(b) claims are potentially stronger than the § 11 claims"); *In re PaineWebber*, 171 F.R.D. at 133 (collecting cases and scenarios). *The fact that class members have claims of different strength, warranting different awards, does not require that each group be represented by different counsel. . . .*

*Id.* at *5 (emphasis added).

In *Schulte*, a class action settlement resolved claims that Fifth Third Bank had inappropriately manipulated transactions to inflate overdraft fees on debit card purchases and ATM withdrawals. The settlement did not provide for awards proportioned to the fees incurred, but required customers to select a 45 day period within the class period for the reimbursement of fees. The court (Dow, J.) found this appropriate because it recognized the fact that the strength of the claims diminished with the extent of the overdraft activity:

> As the Court recognized in its order preliminarily approving the settlement, "when real and cognizable differences exist between the likelihood of ultimate success for different plaintiffs, it is appropriate to weigh distribution of the settlement in favor of plaintiffs whose claims comprise the set that was more likely to succeed." *In re PaineWebber Ltd. Partnerships Litigation*, 171 F.R.D. 104, 133 (S.D.N.Y.1997) (internal quotations and citations omitted); see also id. (collecting cases); see also *In re Lucent Techs., Inc., Secs. Litig.*, 307 F.Supp.2d 633, 649 (D.N.J.2004) (citing *In re Cendant Corp. Litig.*, 264 F.3d

> 201, 248–49 (3d Cir.2001) ("Courts have routinely approved plans of allocation that provide different payments to class members.")).
>
> By reimbursing customers for damages incurred in a 45–day period, the settlement recognizes that customers who incurred "surprise" charges have stronger claims than the "chronic overdrafters" who paid many fees over a long period of time. This allocation method ensures that the benefits of the settlement are made available to all Class Members, while protecting the interests of Class Members with the strongest claims—those who incurred "surprise" overdraft charges—from erosion of the settlement fund by Class Members who were chronic overdrafters, and therefore those with arguably the weakest claims. Approximately 72% of all overdraft fee revenue was generated from the approximately 7% of Fifth Third's customers who overdrafted six or more times a month. Sullivan Affidavit ¶ 10. As the Court has explained, these frequent overdrafters arguably have weaker claims than the other Members of the Settlement Class because they can be said to have had actual or constructive notice of Fifth Third's reordering policies and are more susceptible to defenses such as the voluntary payment doctrine. The way in which the settlement allocates benefits is fair because it recognizes these important differences among Class Members. What would be "arbitrary, unreasonable, and unfair[ ]" (Objector Kannapel's words) would be to distribute 72% of the settlement fund to the 7% of Class Members who have the weakest claims.

*Schulte*, 805 F. Supp. 2d at 589-90. The *Schulte* court cited with approval the order preliminarily approving the settlement that received final approval in *Trombley v. National City Bank*, 826 F. Supp. 2d 179 (D.D.C. 2011), settling a similar case by allowing class members to file claims for reimbursement of overdraft fees incurred during any two months of the class period, for the same reasons. "This allows the settlement proceeds to go to the unwitting victim rather than the chronic overdrafter, who could be construed as having received constructive notice of the bank's resequencing practice and, hence, has a weaker claim."

In *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. at 133, a securities case, the court described the law on this issue as follows:

> [W]hen real and cognizable differences exist between the "likelihood of ultimate success" for different plaintiffs, "it is appropriate to weigh 'distribution of the settlement ... in favor of plaintiffs whose claims comprise the set' that was more likely to succeed." Such merit-based weighting has been approved by courts in this Circuit and elsewhere where substantially different or additional claims have been asserted by certain class

members and not others; where the liability of a defendant has been altered in relation to some class members because of a separate settlement or judicial determination; where different plaintiffs have "substantially" different vulnerabilities to statute of limitations defenses; and where the injuries claimed by different class members have been sustained under significantly different legal or factual circumstances. As a general rule, the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information.

*Id.* (citations omitted). After noting that "Class Counsel has performed a thorough and detailed analysis of the merits of all the claims in this case," the court inquired whether the allocation plan "was fair and reasonable in light of the information collected and the analyses performed." *Id.* at 134.

Likewise, in *In re Lucent Techs., Inc., Secs. Litig.*, 307 F. Supp. 2d 633, 649 (D.N.J. 2004), the court found that "Courts have routinely approved plans of allocation that provide different payments to class members. . . . [W]hen real and cognizable differences exist between the 'likelihood of ultimate success' for different plaintiffs, 'it is appropriate to weigh 'distribution of the settlement ... in favor of plaintiffs whose claims comprise the set' that was more likely to succeed.' . . . [I]n *In re Oracle Sec. Litig.*, No. C–90–0931–VRW, 1994 WL 502054, at *2 (N.D.Cal. June 18, 1994), the court approved a plan of distribution in which the class members' recovery ranged from 10% to 100% of the damages calculated by the expert." Noting that notwithstanding extensive notice, "no Class Member has objected to the Plan of Allocation", the court concluded that the "proposed Plan of Allocation is a fair, reasonable, and adequate method for allocating the Settlement Fund among the various members of the Class."

*Ervin, Gehrich*, *PaineWebber*, *Lucent* and *Schulte* point the way to the appropriate conclusion in this case. *"*When it comes to protecting the interests of absent class members, courts should not let the perfect become the enemy of the good.*" Smith v. Family Video Movie*

*Club, Inc.,* 311 F.R.D. at 475, citing *Mullins v. Direct Digital, LLC,* 795 F.3d 654, 668 (7th Cir. 2015). "[I]f subclassing is required for each material legal or economic difference that distinguishes class members, the Balkanization of the class action is threatened." *Williams v. Rohm and Haas Pension Plan*, 658 F.3d 629, 635 (7th Cir. 2011).

As another court pointed out in a similar situation, where an allocation plan was upheld without the creation of subclasses, the creation of subclasses has its own drawbacks and is not a panacea:

> . . . Subclassing is but one of many available options for limiting the possibility of intraclass conflicts; it is not required as a matter of course. Rather, subclasses might only be needed when there is a "fundamental" conflict among class members, but no such conflict exists here. . . . District courts have broad discretion in determining whether to create subclasses. Courts have often affirmed district court decisions not to establish subclasses—including where, as here, the Settlement is crafted such that different payment levels reflect the relative value of the different claims. . . .

*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010, supra*, 910 F.Supp.2d 891, 917-18 (E.D.La. 2012).

The same problem is present here. In theory, one could have a subclass for each different fax sent by defendant and each permutation regarding whether the defendant had previously done business with a recipient. As in *Deepwater Horizon*, it is likely that anyone who received more than one fax would be in multiple subclasses. There is no practical reason to have this, particularly where the recovery received by anyone who files a claim is likely to substantially exceed the actual damage caused by receipt of the offending faxes.

The appropriate practical resolution is to permit the class action to proceed, but exercise caution to make sure that the prosecution of the action and any settlement is reasonable to all concerned, so that class members receive reasonable relief. In this case, that goal has been

9

accomplished in the proposed settlement.

## IV. THE SETTLEMENT IS REASONABLE AND REFLECTS REAL AND SUBSTANTIAL DIFFERENCES IN THE STRENGTH OF THE CLAIMS

In the present case, the settlement is reasonable and reflects the strength of the various claims.

The Telephone Consumer Protection Act prohibits the use of "any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement." 47 U.S.C. §227(b)(1)(C). The TCPA defines "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C. §227(a)(5).

The Federal Communications Commission has issued an order providing that "messages whose purpose is to facilitate, complete, or confirm a commercial transaction that the recipient has previously agreed to enter into with the sender are not advertisements for purposes of the TCPA's facsimile advertising rules." *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 21 FCC Rcd. 3787, 21 F.C.C.R. 3787, 38 Communications Reg. (P&F) 167, 2006 WL 901720 (April 6, 2006); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005*, 71 FR 25967 (May 3, 2006). As an example of such communications, the FCC pointed to a subscription renewal notice, noting that if "the recipient is a current subscriber and had affirmatively subscribed to the publication," the fax would not qualify as an advertisement even though it encouraged a continued or future subscription. "In order for such messages to fall outside the definition of 'unsolicited advertisement,' they must relate specifically to existing

10

accounts and ongoing transactions."

Applying this framework, the Non-Transactional claims are stronger than the Transactional Fax claims. The Non-Transactional Faxes, such as Cmplt., Ex. A, are advertisements that promote Defendant's products and services, without any pretense of implementing a transaction.

Plaintiff would have a much greater challenge proving that the Transactional Faxes are unsolicited advertisements subject to the TCPA. The Transactional Faxes result from Defendant's prior authorization process. When a pharmacy receives a prescription, it determines whether the patient's health plan will approve and pay for the prescribed drug without any further documentation or approval. If it will not, the pharmacy would use Defendant's system and input information regarding the patient and the drug, initiating a transaction by which a "P[rior] A[uthorization] Request" form would be faxed to the patient's healthcare provider to seek prior authorization to dispense the prescription and be reimbursed by the provider. CoverMyMeds is compensated by others for processing those PA Requests. The Transactional faxes encourage recipients to use CoverMyMeds' system to process the PA Requests. Plaintiff contends that they therefore constitute "advertisements." However, because the principal content of the faxes is to process a particular transaction for an individual patient, the claim is substantially weaker than that claims involving Non-Transactional Faxes, which do not contain any patient-specific transaction information. *Grind Lap Services, Inc. v. UBM LLC,* 14 C 6448, 2015 WL 6955484 (N.D.Ill., Nov. 10, 2015).

In short, there are "real and cognizable differences" between the "likelihood of ultimate success" for Non-Transactional Fax claims and Transactional Fax claims. *In re Lucent Techs.,*

*Inc., Secs. Litig.,* 307 F. Supp. 2d at 649 (D.N.J.2004). The parties recognized these differences in the settlement discussions, as did retired Judge Holderman, acting as mediator. (See: EX 2 - Declaration of Hon. James F. Holderman (Ret.))

V. **THE FACT THAT PLAINTIFF HAS CLAIMS NOT SHARED WITH 100% OF THE CLASS MEMBERS IS NOT A BARRIER TO CERTIFICATION**

It is quite common for a class action plaintiff to have claims which do not apply to 100% of the class members. Often, this is because there are multiple federal and state claims applicable to the same conduct, with different limitations periods. In other cases, the plaintiff will have been subjected to multiple violations, some of which present stronger claims than others. Sometimes, the plaintiff will have individual claims as well as class claims.

Heretofore, courts have not considered this to be a bar to certification, for purposes of either litigation or settlement. *Bucha v. Illinois High School Ass'n*, 351 F.Supp. 69, 72 (N.D.Ill. 1972) ("the fact that the named plaintiffs have interest which exceed those of some class members will not defeat the class action, so long as they possess interests which are coextensive with those of the class"); *Evans v. City of Evanston*, 84 C 2718, 1985 WL 4100 (N.D.Ill., Nov. 20, 1985) (similar); *First America Corp. v. Foster*, 51 F.R.D. 248 (N.D.Ga. 1970) (similar); *Stewart v. Winter*, 669 F.2d 328, 334-35 (5th Cir. 1982) (substantial damage claim in a prisoner civil rights case did not made the claimant an inadequate representative of a class seeking injunctive relief); *Walker v. City of Calhoun,* 4:15cv170, 2016 WL 361580, *8 (N.D.Ga., Jan. 28, 2016), appeal pending (no problem where the named plaintiff had individual damage claims in addition to the claims asserted on behalf of the class).

If it was improper for a class action plaintiff to have several claims which do not apply to 100% of the class members, it would be effectively impossible to bring most class actions.

For example, if a defendant is faced with Truth in Lending claims (one year statute of limitations but statutory damages) and a state law contract or consumer fraud claim based on the same conduct (three or five year statute but no statutory damages), the plaintiff would have to limit any class to the one year period. The defendant would most likely refuse to settle for just the one-year class, as doing so would leave it exposed to persons who have contract or consumer fraud claims, even though they are not as strong. If no additional plaintiff comes forward, the possibility of having a second class representative with only the weaker claim is not feasible.

In *Ervin v. OS Restaurant Services, Inc.,* 632 F.3d 971 (7th Cir. 2011), plaintiffs sought to certify both an FLSA collective action, which applies only to persons who affirmatively opt in and is governed by a two or three year statute of limitations, depending on the defendant's culpability, and Rule 23 classes for state law claims under the Illinois Minimum Wage Law, which is governed by a 3 year statute, and the Illinois Wage Payment and Collection Act, which is governed by a 5 year statute. The district court found the conflicting procedures to bar certification of the state law claims. The Seventh Circuit reversed, holding that there was nothing *per se* improper about such an action or with the proposition that not all class members are asserting identical claims:

> Outback complains that permitting a plaintiff who ends up in only the Rule 23(b)(3) class (because she neither opted out of that class nor opted in to the FLSA collective action) to proceed as part of the state-law class is in tension with the idea that disinterested parties were not supposed to take advantage of the FLSA. But such a plaintiff is doing no such thing. She will not be entitled to a single FLSA remedy, because she is not part of the FLSA litigating group. . . . In the case before us, the Rule 23(b)(3) class and the federal collective action are each comprised of a set of employees asserting injuries under either state or federal law. Should either or both groups prevail on the merits, each group member will receive only the relief that is prescribed under the law governing her part of the case. Some may be part of both the FLSA group and the Rule 23 class; some may be in one but not the other. We conclude that there is nothing in the FLSA that forecloses these possibilities. (632 F.3d at 978)

*Accord, Smith v. Family Video Movie Club, Inc.,* 311 F.R.D. 469 (N.D.Ill. 2015) (Lee, J.).

## VI.  CONCLUSION

Under the circumstances, the Court should grant preliminary approval and direct notice to the class. Individual notice will be provided, and the notice points out the difference in recovery between Transactional and Non-Transactional faxes.

                              Respectfully submitted,

                              s/ Daniel A. Edelman
                              Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
Dulijaza Clark
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service:  courtecl@edcombs.com

T:\32345\Pleading\Plaintiff's Supplemental Memorandum in Support of Prelim Approval 6-18-16_Pleading.wpd

## CERTIFICATE OF SERVICE

I, Daniel A. Edelman, hereby certify that on June 20, 2016, I caused a true and accurate copy of the forgoing document to be filed with the Clerk of the Court using the CM/ECF System which will send notification of the following to:

Isaac J. Colunga
Bart Thomas Murphy
Martha L. O'Connor
Ice Miller LLP
2300 Cabot Dr.,
Suite 455
Lisle, IL 60532
(630) 955-6124
isaac.colunga@icemiller.com
bart.murphy@icemiller.com
martha.oconnor@icemiller.com

Heather Lynn Maly
Ice Miller
200 W Madison Street
Suite 3500
Chicago, IL 60606
(312) 726-8107
Heather.Maly@icemiller.com

    /s/ Daniel A. Edelman
    Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Dulijaza Clark
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
20 South Clark Street, Suite 1500
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)